CHIEF JUSTICE STITES
delivered the opinion op the court:
Peter Yeaker, a native of Switzerland, many years ago removed to, and became a naturalized citizen of, the United States. He died in Woodford county in tins State, in July 1853, the owner of .a considerable estate in said county, consisting of land, slaves and personalty. He left a widow, a native of this country, but no children, and all of his kindred, at the time of his death, were, and so far as the record shows, continue to be foreigners and citizens of Switzerland.
In 1859 proceedings were commenced fora sale and distribution of the estate between the widow and kindred of the intestate, and the circuit judge, having decided that the latter were not entitled to any part of the realty, they have prose-an ted this appeal.
At common law an alien could not inherit land, and such has been and is still the law in Kentucky, except so far as it has been modified by statute. It was determined at an early day by this court that aliens could not inherit land in this State. (Hunt vs. Warnick, Hardin, 61; White vs. White, 2 Met. 187.)
By an act of 1800 (Morehead & Brown's Digest, 1 vol. 112)—an alien friend, residing in this State two years, was entitled to receive, hold and pass any right to land within the commonwealth, during the continuance of his residence after that, .period; and this provision was substantially embodied in the Revised Statutes. (1 vol Stanton, 239.). But as neither of ap- *35 pelianis ware residents of Iletaiusky at the time of Yeakei** death, no benefit accrued to them under this statute.
Indeed it is admitted that, unless they can claim under certain treaty regulations between the foreign State, of which they are citizens, and the United States, the judgment of the circuit court, declaring the widow entitled to the land, cannot be disturbed. And it therefore becomes necessary to consider and determine the scope and effect of the treaties relied on.
The first treaty between the United States and the Swiss Confederation, to which we have been referred, was ratified on the 3d May, 1848, and is found in the United States Statutes at large for that year.
Among other stipulations it contains the following:
“Article 2. — If, by the death of a person owning real property in the Territory of one of the high contracting parties, such property should descend either by the laws of the country, or by testamentary disposition to a citizen of the other party, who, on account of his being an alien,could not be permitted to retain the actual posse sion of such property, a. term of not less than three years shall be allowed to him to dispose of such property, and to collect and withdraw the proceeds thereof, without paying to the government any other charges than those, which in a similar case, would be paid by an inhabitant of the country in which such real property may be situated.
By the 3d article it is provided that said treaty shall remain in force for twelve years from its date, and further, until the end of twelve months after either government shall have given notice of its intention to terminate the same.
The second treaty seems to have been signed in November 1850, but was not ratified until November, 1855. (U. S. Statutes at large 1855.) The official proclamation of the President. making it public, as a law, speaks thus of the treaty, the period of its execution and the amendments to the same: *36 of November, 1850; which convention an subsequently amended by competent authorities of the respective governments, and being in the English and French language, is word for word as follows,” &c.
*35 “Whereas, a general convention of friendship, reciprocal establishments, commerce and for the surrender of fugitive criminals, between the United States of America and the Swiss Confedetation, was concluded and signed by their respective plenipotentiaries in the city of Berne on the 25th day
*36 The stipulations of this treaty in regard to the subject now under consideration read thus:
“Ahticlb 5. The citizens of each one of the contracting parties, shall have power to dispose of their personal property within the jurisdiction of the other by sale, testament, donation or in other manner; and their heirs, whether by testament, or ab intestato, or their successors, being citizens of the other party, shall succeed to the said property, or inherit it, and they may take possession thereof, either by themselves or by others acting for them; they may dispose of the same as they may think proper, paying no other charges than those to which the inhabitants of the country wherein the said property is situated, shall be liable to pay in a similar case. In the absence of such heir, heirs or other successors, the same care shall be taken by the authorities for the preservation of the property that would be taken (or the preservation of the property of a native of the same country, until the lawful proprietor shall have had time to take measures for possessing himself of the same.”
“The foregoing provisions shall be applicable to real estate situated within the States of the American Union, or within the cantons of the Swiss Confederation, in which foreigners shall be entitled to hold or inherit real estate.”
“But in e.ase real estate situated within the territt ries of one of contracting parties should fail to a citizen of the other party', who, on account of bis being an alien, could not be permitted to hold such property in the State or in the canton in which it may be situated, there shall be accorded to the said heir or other successor, such term as the laws of the State or canton will permit, to sell such property; he shall he at liberty at all times to withdraw and export i he proceeds thereof without difficulty, and without paying to the government any other charges than those which, in asimilar case, would be paid by an inhabitant of the country in which the real estate may be situated.”
*37 If, as is contended by appellants, this last treaty, by relation back from November, I8S5, the dry cf Ho ermhangs and “~+i-fication by the contracting powers, took effect and became the law of the land from November 1850, the day of its daté, without regard to the period or periods when the amendments referred to in the proclamation were agreed upon and adopted, we confess there is difficulty in avoiding the conclusion that appellants, under the articles cited, have an interest, to some extent, in the real estate of their deceased relative.
The constitution of the United States, in the second section of article VI, declares that “This constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall he bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding.”
The treat}' before us seems to have been made with clue solemnity between the contracting parties, adopted and ratified by the proper authorities, and proclaimed as the law of the land by the President. Its provisions with regard to real estate, appear to have been carefully drawn, with an eye to the rights of the several States and their local regulations respecting such property, within their boundaries, and give to the subjects oí the Swiss Confederation only the share of the proceeds of the realty, when by the laws of any State they are forbidden from holding the. realty itself.
It may be said to be the well settled doctrine in relation to treaties, that, as to the Governments making them, they take effect, not merely from the day of ratification, but from the date of their execution, unless they contain stipulations to the contrary. (Wheaton’s International Law, 336; 1 vol. Kent, 170; 9 Howard S. C. Rep., 148, 289.) But the rule seems to be otherwise where individual rights are to be affected thereby, as settled by the supreme court in the‘case of United States vs. Arredendo. (6 Peters, 749.) In regard to that point, which was then raised, the court, in speaking of the treaty then under consideration, say “That it may and docs relate to its date as *38 between the two governments, so far as respects the rights of either under it, may be undoubted; but as respects individual rights, in any way affected by it, a very different rule ought to prevail.” And in the next sentence, after remarking that the point was not new, state, that in regard to individual rights, the rule is, that the ratification of the treaty must be deemed its date..
Admitting however that the rule contended for in this case, was the correct one, it is extremely questionable whether this court could'say, in view of the proclamation of the President, supra, that the articles of the treaty relied on by appellants in support of their claim, constituted any part of the Original treaty when, signed.
It seems that the original document was signed in Nov. 1850, hut it further appears that it was subsequently amended. Now what amendments were made, or. when, does not appear.. For aught that appears to the contrary the very radi-cles upon which appellant founds his claim, may have been the only amendments made, and they may have been inserted long after Yeaker’s death and the accrual of the widow’s right. And, in view of this state of uncertainty as to when the articles referred'to were embodied, it would be difficult, to , say they were in force when Yeaker died. But this point need not now be decided, inasmuch as the treaty, for the reason heretofore stated, so far as Mrs. Yeaker’s rights are concerned, did not go into effect until 1855, when it was ratified.
The treaty of 1848, in our opinion, is likewise insufficient to uphold appellants, claim to an interest in the property now in dispute — Because (1.) it may be seriously doubted whether the second article of said treaty intended to confer upon the citizens of the. confederation any right to real estate or its proceeds, unless the land was situate within the territories of the United States, that is, the districts of country known as “territories,” and'distinguished from the States.
The language is “ If, by the death of a person owning property in the Territory of one of the high contracting parties, such property should descend,” &c.
*39 The doubt mentioned arises, not only because of the equivocal language thus used to describe the district of country in which the proposed right of succession or inheritance was to be conferred; but also from the fact that the treaty of 1855, in reference to the same matter, is specific and distinct in extending this right to land within the States of the Union, and also in providing for any conflicting State or local legislation —thus showing tnat the contracting parties themselves deemed the right conferred by the previous treaty as not distinctly extended to the States.
But, waiving the question arising upon a proper construction of the language of the treaty in regard to the point suggested, and giving full effect to the provision as contended for by appellants, still they are precluded from' the interest claimed by lapse of time.
We have seen, and it is admitted, that by the law of Kentucky appellants could take no interest in the realty of their deceased relative. It is also well known that by the statutes of descent (1st Stanton Ed., 420,) the widow, in this case, took the entire real estate. This being the law of this State it was in full force and effect, so far as the parties hereto are concerned, except as restricted by articlé 2 of the treaty of 1848. To the extent of its conflict with said treaty it must give way, because, by the constitutional provision supra, the treaty is regarded as paramount to the State law. The law of the State refuses all right to appellants at any and all times ; the treaty however invests them with an interest provided it is asserted within a period of three years after the right accrues ; or rather it forbids any law limiting their right ©f recovery to less than three years, the effect of which is to permit any restriction by State legislation against such recovery, which will not interfere with the-right for that period. The State law was trheT-efore s.o affected by the treaty asrio become inoperative for a period of three years, but no further — it being a well settled rule that when a State law is deemed unconstitutional, because opposed- to the 'Cons.iihition, laws and treaties of the Federal Government, it is only void so far as it contravenes the Constitution, laws or treaties. Beyond the three years, the *40 period within which foreigners may claim such interest, there is no contravention, because there is nothing forbidding the State legislation which denies the right to that class of persons after that time. . .
It seems to us, therefore, that no error was committed by the circuit court in giving all the proceeds of the land to the widow — appellants having permitted more than three years after Yeaker’s death to elapse before they brought their suit or asserted their right.
Judgment affirmed.